UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| **SUSAN HUNTZINGER,** *et al.*, | **CIVIL ACTION NO. 5:17-CV-184-KKC** |
| **Plaintiffs,** | |
| **V.** | **OPINION AND ORDER** |
| **TOBY COYLE,** | |
| **Defendants.** | |

*** *** ***

This matter is before the Court on the Defendant's motion for summary judgment.  (DE 55.)  For the reasons stated below, the motion is **DENIED**.

## I.  BACKGROUND

This case stems from the shooting of Kenneth Huntzinger ("Kenneth"). Kentucky State Police ("KSP") Trooper Sergeant Toby Coyle responded to a call for assistance placed by Plaintiff Susan Huntzinger ("Huntzinger"), Kenneth's wife.  Shortly after arriving on the scene, Coyle shot Kenneth in the left arm.  Kenneth died eight days later from his injuries.

On February 7, 2017, R.H., Kenneth and Huntzinger's son, was playing video games in his room when Kenneth came in wearing pajamas and boots.  (DE 56-1 at 6-7.)  Kenneth was slurring his speech and talking about wanting R.H. to come help remove cats, dogs, and people from their residence.   (DE 56-1 at 8-9.)   R.H. suspected that Kenneth had overmedicated himself, so he told him to go to bed.  (DE 56-1 at 9-10.)  Huntzinger also observed Kenneth's behavior and suspected that he had overmedicated himself.  She too tried to get Kenneth to go to bed.  (DE 56-1 at 11.)   Despite the family's efforts to physically stop Kenneth, he ended up getting the keys to his truck and got into his vehicle. (DE 56-1 at 12-

13.) Sometime during this interaction, Kenneth got somewhat physical with Huntzinger and R.H., pushing them away so that he could access his truck. (*See* DE 56-2 at 7.)

R.H. stated that he was watching his dad from the window of his residence as Huntzinger called her sister, Amanda White, for assistance. (DE 56-1 at 13-15.) Thereafter, Kenneth began to maneuver his truck, which was positioned between Huntzinger's vehicle and the garage of their residence. R.H. stated that he observed Kenneth "tip" Huntzinger's car as he began to maneuver his vehicle. (DE 56-1 at 14-15.) R.H. ran outside, opened the driver's side door of the truck, and unsuccessfully attempted to stop Kenneth from driving. (DE 56-1 at 14.) As Kenneth continued to move the truck, R.H. stated that he observed Kenneth make contact with Huntzinger's vehicle a couple of times and the residence one time. (DE 56-1 at 22.)

Huntzinger called 911, told dispatch that Kenneth had "over taken" his medication, including Ambien and other pills,[1] and was trying to take their 14-year old son, R.H., out in his truck. (DE 55-4 at 7.) She further told the dispatcher that Huntzinger had gotten physical with her and R.H. and hit her vehicle while trying to push it out of the way. (DE 55-4 at 11-12.) She also stated that Kenneth would probably be combative with police upon their arrival. (DE 55-4 at 15.)

Thereafter, White arrived at the residence. White and Huntzinger continued to try and convince Kenneth to stop driving, but he continued to maneuver the truck. R.H. went and sat in the passenger's seat of White's car, where he observed the following events unobstructed. (DE 56-1 at 15-17.)

---

[1] It is not entirely clear to the Court what pills Kenneth took the night of February 7, 2017. Kenneth was prescribed Ambien, hydrocodone, and testosterone. There is also evidence in the record that he abused his medications. However, there is no indication that Coyle knew about Kenneth's use of hydrocodone or testosterone or abuse of these medication. Instead, the dispatcher informed Coyle that Kenneth had taken Ambien and "other pills." (DE 55-4 at 7.)

Dispatch relayed the information provided by Huntzinger to Coyle.  (DE 55-4 at 17-18.)  Upon arrival, Coyle pulled up in the yard next to the Huntzingers' residence and observed Kenneth moving the vehicle back and forth, hitting the garage and Huntzinger's car. (DE 55-4 at 18.)  Coyle characterized the contact as "ramming" the truck against the garage area of the residence.  (DE 55-2 at 9-10.)   Coyle exited his cruiser and pulled out his gun as he approached the truck.  (DE 55-2 at 13.)  Coyle gave verbal commands for Kenneth to stop the truck and get out of the vehicle, which went unheeded.  (DE 55-2 at 13-16.)

There are divergent accounts of what exactly happened next.  Coyle stated that he approached the driver's side of the truck and attempted to open the door, pulling the handle three or four times.  (DE 55-2 at 14.)  When that was unsuccessful, he used a metal baton and attempted to break the window, which cracked but did not break. (DE 55-2 at 15.)  Coyle stated that he then began retreating slowly away from the truck back toward his cruiser.  As he was retreating, he pulled out his gun again and began shooting at the tires on the driver's side of the truck to "incapacitate" the vehicle. (DE 55-2 at 17-18.)  After hearing the tires deflate, Coyle stated that the truck continued to move, and it was no longer stuck between Huntzinger's car and the garage.  (DE 55-2 at 20, DE 56-4 at 26.)  Coyle stated that the truck then accelerated forward "straight at [him]" and it was moving toward him and the street "at a high speed[.]"  (DE 55-2 at 21.)  He stated that as the truck was coming at him, he fired his gun toward the windshield and engine block.  (DE 55-2 at 21.)  Elsewhere in his deposition, Coyle stated that he was on the driver's side of the vehicle as he began shooting. (DE 56-4 at 27-28.)  According to Coyle, he does not recall how far away he was from the vehicle, but the driver's side of the truck ended up passing him as he continued to shoot into the truck.  (DE 55-2 at 18, 21.)

Huntzinger and R.H. tell a different story.  Huntzinger stated in her deposition that she observed the entire interaction from the front porch of the house.  (DE 56-2 at 13.)  She stated

that upon arrival, Coyle approached the truck from the driver's side with his gun drawn and gave verbal commands for Kenneth to stop the car.  (DE 56-2 at 13-14.)  She stated that the truck was slowly moving back and forth in the driveway and that the truck was barely moving when Coyle began shooting from the driver's side.  (DE 56-2 at 14-15.)  Huntzinger further stated that she could not tell exactly on the truck Coyle was shooting, but he was standing ten to fifteen feet away from the truck when he took the first shot.  (DE 56-2 at 15.)  In an interview following the shooting, an investigator reported that Huntzinger told him that Kenneth "floored the truck" and Coyle had to "jump out of the way to avoid being hit."  (DE 55-4 at 25.)  Shortly after the incident, Huntzinger messaged Coyle on Facebook, thanked him for helping, and stated: "[y]ou had to shoot him because he was going to hurt you or run over [*sic*]."  (DE 55-4 at 26.)  Huntzinger also posted publicly to Facebook.  She stated that Coyle did everything he could to calm the situation and that she does "not hold him responsible because he was doing his job."  (DE 55-3 at 33-34.)

R.H. stated that he observed Coyle pull up onto the adjacent yard.  (DE 56-1 at 23.)  At that time, it appeared that Kenneth had successfully maneuvered his vehicle such that he was no longer blocked from exiting the driveway. (DE 56-1 at 22.)  R.H. stated that Coyle exited his vehicle with his gun drawn.  Coyle yelled at Kenneth to get out of the vehicle and within 30 seconds, Coyle began shooting at the truck.  (DE 56-1 at 27.)  Within those thirty seconds, R.H. stated that Kenneth was easing on and off the break and the truck was easing forward "a little bit." (DE 56-1 at 26.)  R.H. stated that the truck never moved toward Coyle and that Coyle was on the right of the driver's side of the truck throughout the duration of the interaction, including when the shots were fired.  (DE 56-1 at 27-28.)

It is undisputed that Kenneth was shot through the driver's side window in the left arm and that approximately one minute elapsed from the point that Coyle arrived to when he began shooting into the cab of Kenneth's truck.  (DE 56-4 at 35, DE 56-9 at 1.)  Following the

shooting, Coyle rendered aid to Kenneth. (DE 55-3 at 35-37.)  Kenneth was transported to the University of Kentucky Hospital and died eight days later.  (DE 55-3 at 12.)

On April 20, 2017, Huntzinger—individually, as administrator of the Estate of Kenneth Huntzinger, and as custodian and legal guardian of R.H.—and her other son, Brandon Huntzinger ("Plaintiffs"), brought suit against Coyle, in his individual and official capacity, and the Commonwealth of Kentucky, doing business as the KSP.  (DE 1.)  Plaintiffs asserted claims pursuant to 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments, and various state law causes of action.  (DE 1 at 7-12.)  Plaintiffs subsequently dismissed all claims against the Commonwealth of Kentucky and Coyle in his official capacity.  (DE 7.)  Coyle asserted counterclaims against the Plaintiffs, however, those claims have also been dismissed.  (DE 54.)

Plaintiffs § 1983 claims and state law causes of action against Coyle in his individual capacity remain before the Court.  Coyle has filed a motion for summary judgment requesting dismissal of all remaining claims.  (DE 55.)  Coyle asserts that he did not violate Kenneth's constitutional rights and that he is protected by qualified immunity on all claims.

The Court finds that there are genuine issues of material fact precluding the granting of Coyle's motion for summary judgment.  Accordingly, Coyle's motion is denied.

## II. ANALYSIS

### A. Standard of Review.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). All evidence, facts, and inferences must be viewed in favor of the non-moving party.

5

*United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "In order to defeat a summary judgment motion… [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment must be entered if, "after adequate opportunity for discovery," a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citation to *Celotex*, 477 U.S. at 322 and internal quotation marks omitted).

**B.  42 U.S.C. § 1983 Claims.**

Plaintiffs' Complaint pleads § 1983 claims against Coyle for violations of the "Fourth and Fourteenth Amendments to the United States Constitution."  (DE 1 at 7.)  Section 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States...." *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 924 (1982); *Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir. 1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Whether the Fourth, Eighth, or Fourteenth Amendment applies to a claim of excessive force "depends on the status of the plaintiff at the time of the incident; that is, whether the plaintiff was a free citizen, convicted prisoner, or fit in some gray area in between the two." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). As the Sixth Circuit has explained:

> The Fourth Amendment's prohibition against unreasonable seizures bars excessive force against free citizens while the Eighth Amendment's ban on cruel and unusual

6

punishment bars excessive force against convicted persons. When a citizen does not fall clearly within either category—e.g., pretrial detainees—the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force.

*Id*. (internal citations omitted).

Here, Kenneth was not a convicted person. Instead, Plaintiffs' § 1983 claim may only be brought pursuant to the Fourth Amendment.

An excessive force claim pursuant to the Fourth Amendment turns on the objective reasonableness of the force used based on the totality of the circumstances. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001). "[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (quoting *Tennessee v. Garner*, 471 U.S. 11 (1985)).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If the law at the time [of the conduct] did not clearly establish that the [official's] conduct would violate the Constitution, the [official] should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has further clarified that "conduct violates clearly established law" if, at the time of the conduct, the "contours" of the right were "sufficiently clear" such that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations, internal quotation marks, and brackets omitted). Qualified immunity will apply "if reasonable officials could disagree as to whether the conduct violated the plaintiff's rights." *Thomas v. Cohen*, 304 F.3d 563, 580 (6th Cir. 2002). The law does "not require a case directly on point, but

7

existing precedent must have placed the statutory or constitutional question beyond debate."
*Ashcroft*, 563 U.S. at 741. In other words, the conduct at issue need not have "previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent."
*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

"Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question."
*Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). However, a plaintiff has the burden of proving that a defendant is not entitled to qualified immunity and must show that the right at issue is clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). "[T]he plaintiff must effectively pass two hurdles when facing a defendant on summary judgment who claims qualified immunity. First, the allegations must state a claim of violation of clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992) (citations and internal quotation marks omitted).

Plaintiffs allege that Coyle's conduct constituted "unreasonable, excessive force" and a violation of the Fourth Amendment.  "Because it is axiomatic that individuals have a clearly established right not to be shot absent probable cause to believe that they pose a threat of serious physical harm, [the Court] must determine whether [Coyle's] use of deadly force was unreasonable under the Fourth Amendment." *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (citing *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). "Claims of excessive force are analyzed under an objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene." *Miller v. Sanilac Cty.*, 606 F.3d 240, 251 (6th Cir. 2010).

"Fourth Amendment excessive-force inquiries require a careful balancing of the force used against the countervailing governmental interests at stake." *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (citation and internal quotation marks omitted). The Court must consider the totality of the circumstances, with special attention given to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Garner*, 471 U.S. at 8-9). "These factors help inform our ultimate inquiry, which must always be whether the totality of the circumstances justified the use of force." *Mullins*, 805 F.3d at 765 (citation and internal quotation marks omitted).

The Court finds that there are genuine disputes as to material facts and that Coyle is not entitled to judgment as a matter of law on the question of whether he violated Kenneth's clearly established Fourth Amendment rights.  Although it is undisputed that Kenneth had taken prescribed medication, was attempting to drive, failed to heed the officer's commands, and continued to move his vehicle, it is unclear whether Kenneth posed a threat of serious physical harm to the safety of Coyle or others.[2]  First, there are genuine disputes regarding the rate of speed the vehicle was traveling both as it was maneuvering within the driveway[3]

---

[2] Coyle cites that the residence was a very short distance from US 25, a busy highway in Madison County Kentucky.  (DE 55-1 at 26.)  While the distance to the highway is a relevant consideration in determining whether Kenneth posed a threat of serious physical harm to others, it is not the only consideration.  At this point, there are genuine issues of fact regarding Kenneth's actions in the driveway that preclude the Court from making a finding that Kenneth posed a threat of serious physical harm to the public.

[3] Coyle stated that he observed the truck "ramming" the residence and Huntzinger's vehicle (DE 55-1 at 21, DE 55-2 at 10).  Huntzinger, however, stated in her deposition that she observed the truck slowly moving back and forth in the driveway.  (DE 56-2 at 14-15.)  R.H. stated that he observed his father's truck "tip" Huntzinger's car a couple of times and the residence once. (DE 56-1 at 22.)  R.H. further stated that Kenneth was easing on and off the break and the truck was easing forward "a little bit." (DE 56-1 at 26.)  Additionally, the images presented to the Court show no serious damage to the vehicles or the residence.  (DE 56-11 at 22-25.)

and exiting the driveway.[4]  Second, there are genuine disputes regarding Coyle's positioning

with respect to Kenneth's truck throughout the shooting.[5]  Third, there are disputes as to

whether the truck ever accelerated "straight at [Coyle]"[6]  and whether Coyle was ever in

danger of being hit by the vehicle.[7]  Because of the factual disputes, the Court finds that the

question of whether Coyle violated Kenneth's clearly-established Fourth Amendment

---

[4] Coyle stated that, as the truck as exited the driveway and he began shooting, the truck accelerated forward straight at him "moving quickly ... at a high rate of speed[.]"  (DE 55-2 at 21.)  Additionally, an investigator's report from an interview with Huntzinger following the incident indicates that Kenneth "floored the truck" as he exited the driveway.  (DE 55-4 at 24-25.)  However, Huntzinger and R.H.'s deposition testimony indicate that the truck was moving at a much slower speed.  Huntzinger stated that Kenneth was moving slowly, and he "let off the break ... and moved up just a little bit" when Coyle began shooting.  (DE 56-2 at 14.15.)  R.H. stated that the truck was "easing forward" toward the road when Coyle began shooting.  (DE 56-1 at 26-28.)

[5] Coyle gave differing accounts regarding his positioning throughout the shooting.  Coyle stated that after the truck was successfully maneuvered such that it could exit the driveway, Kenneth accelerated forward "straight at [him,]" and he fired his gun toward the windshield and engine block, which implies that he was directly in front of the truck.  (DE 55-2 at 21.)  However, elsewhere in his deposition, Coyle stated that he was on the driver's side of the truck as he began shooting, and the driver's side of the truck passed him as he continued to shoot. (DE 56-4 at 27-28.)  Both R.H. and Huntzinger gave unequivocal accounts that Coyle was positioned outside the driver's side of the truck for the duration of the shooting. (DE 56-1 at 27-28; DE 56-2 at 14.15.) Additionally, there is no dispute that Kenneth was shot in the left arm through the driver's side window, not through the windshield.  Plaintiffs' expert stated in his deposition that after reviewing the evidence presented to him, "at one point, [Coyle] was *forward* of the truck as it was progressing down the driveway" and, although unlikely in his opinion, the truck could have turned such that it could have made contact with Coyle.  (DE 55-8 at 4-5 (emphasis added).)

[6]  Coyle asserted in his deposition that Kenneth drove his truck "straight at [him]." (DE 55-2 at 21.)  Additionally, the investigator's report from an interview with Huntzinger following the incident indicates that Kenneth "floored the truck" and Coyle had to "jump out of the way to avoid being hit." (DE 55-4 at 25.)  Huntzinger's Facebook message indicates the same.  Huntzinger's deposition testimony, however, indicates differently.  In her deposition, Huntzinger stated that the truck was barely moving when Coyle began shooting from the driver's side.  (DE 56-2 at 14-15.)  R.H. echoes Huntzinger's deposition account.  He stated that although the truck was easing forward "a little bit[,]" Coyle was on the right of the driver's side of the truck throughout the duration of the interaction. (DE 56-1 at 26-28.)

[7] Coyle's deposition testimony, the interview of Huntzinger following the incident, and the Facebook message indicate that Coyle was in danger of being hit by the vehicle.  However, Huntzinger and R.H.'s deposition testimony indicates otherwise.  Huntzinger stated in her deposition that Coyle was ten to fifteen feet away in the grass on the driver's side of the truck when he began shooting. (DE 56-2 at 15.)  R.H. stated in his deposition that the truck moved "toward the road ... [not] towards the Trooper." (DE 56-1 at 26.)  Additionally, the evidence presented to the Court unequivocally demonstrates that Kenneth was shot through the driver's side window.

rights—which hinges on whether Coyle's use of force was objectively reasonable—is inappropriate for summary judgment.

**C.   State Law Claims.**

There are also various state law claims pending before the Court.  Kentucky state law provides government officials with qualified immunity when sued in their individual capacities—"protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (citations omitted).  Here, the parties disagree on whether Coyle was performing a discretionary act when he shot out Kenneth's tires and whether Coyle acted in good faith.

Assuming that Coyle was performing a discretionary action, the Court finds that, at this stage, Coyle's claim for qualified immunity pursuant to Kentucky state law should be rejected.

> To show that a peace officer acted in bad faith when making an on-the-spot judgment call, the complainant must demonstrate that the officer "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate" the complainant's rights or that the officer "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury."

*Scheffler v. Lee*, 752 F. App'x 239, 244 (6th Cir. 2018) (quoting *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007)).  "Thus, the qualified official immunity analysis under Kentucky law 'tracks the inquiry for objective reasonableness and qualified immunity' under federal law." *Id.* (quoting *Woodcock*, 679 F. App'x at 425).

Here, as explained above, there are outstanding questions of fact precluding summary judgment.  Just as the Court rejects, at this stage, Defendant's claim for qualified immunity

under federal law, it makes the same finding as to qualified official immunity under Kentucky state law.

### III. CONCLUSION

Based on the foregoing, the Court **HEREBY ORDERS** as follows:

(1) Coyle's motion for summary judgment (DE 55) is **DENIED**.

(2) This case is set for a telephonic status conference on **September 16, 2020 at 11:30 a.m.** for the purpose of setting new pretrial conference and jury trial dates. The parties shall call 888-684-8852, using access code 6823688. Please dial in a few minutes before the conference is scheduled to begin.

Dated September 04, 2020



KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY